[Cite as *In re M.C.*, 2024-Ohio-720.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: M.C.
    C.C.

C.A. Nos.    30850
                30851

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 21 03 0194
              DN 22 02 0108

DECISION AND JOURNAL ENTRY

Dated: February 28, 2024

---

SUTTON, Presiding Judge.

{¶1} Appellant, C.M. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed two of her minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Mother is the biological mother of M.C., born January 25, 2021; and C.C., born January 31, 2022. The children's father ("Father") voluntarily waived his right to a contested hearing and has not appealed the permanent custody judgment.

{¶3} When this case began, Mother also had an open juvenile case and reunification case plan with an older child, who is not a party to this appeal. The case plan in that case focused on Mother addressing her problems with unstable mental health, substance abuse, and domestic violence in the home. The older child was eventually placed in the legal custody of a relative.

{¶4} Mother has a lengthy history of mental health problems that predate the birth of her children. She had been involuntarily hospitalized numerous times for suicidal ideation and self-harming behavior and, although she engaged in psychiatric medication management since years before this case began, she had a history of going on and off her psychiatric medications and self-medicating with other substances.

{¶5} On March 23, 2021, CSB filed a complaint to allege that M.C., then eight weeks old, was an abused, neglected, and dependent child because, in addition to Mother's ongoing problems, the police had responded to an incident of domestic violence between Mother and Father, and the infant child was in the arms of Father at the time. The juvenile court later adjudicated M.C. as a dependent child and placed him in the temporary custody of CSB.

{¶6} C.C. was removed from the custody of Mother shortly after the child's birth because of Mother's cases with the child's two older siblings and her unresolved parenting problems. The juvenile court later adjudicated C.C. dependent and placed him in the temporary custody of CSB.

{¶7} The case plan reunification goals for each child focused on Mother addressing her history of mental health, substance abuse, and related domestic violence problems. During the trial court proceedings, Mother did not consistently engage in mental health or substance abuse treatment. Instead, she continued to exhibit erratic and violent behavior, resulting in numerous felony and misdemeanor criminal charges and repeated involuntary hospitalizations for mental health treatment.

{¶8} Because Mother failed to make substantial progress on these reunification goals, CSB eventually moved for permanent custody of both children. Following the final dispositional hearing, the trial court terminated parental rights and placed M.C. and C.C. in the permanent custody of CSB. Mother appeals and raises one assignment of error.

II.

## ASSIGNMENT OF ERROR

THE TRIAL COURT ABUSED ITS DISCRETION IN ITS GRANT OF PERMANENT CUSTODY TO [CSB] AS SUCH DECISION WAS NOT SUPPORTED BY THE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶9} Mother's sole assignment of error is that the trial court's permanent custody decision was against the manifest weight of the evidence. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶10} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.)

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact."  *Id*. at ¶ 21.

{¶11}  Mother does not directly challenge the trial court's findings on either prong of the permanent custody test.  Because this case involves the termination of Mother's fundamental parental rights, however, this Court will examine the evidence supporting the trial court's findings on each prong.  *See In re H.P.*, 9th Dist. Summit No. 30685, 2023-Ohio-3700, ¶ 16.  The trial court found that CSB established the first prong of the permanent custody test as to each child because Mother failed to substantially remedy the conditions that caused the children to be removed from her custody and remain placed outside the home.  R.C. 2151.414(B)(1)(a); 2151.414(E)(1).  That finding was supported by substantial evidence.

{¶12}  This case began after the police responded to an incident of domestic violence between Mother and Father.  Mother's mental health, substance abuse, domestic violence, and criminal problems were identified as problems in the adjudication of each child and continued to be problems for Mother throughout this case.

{¶13}  CSB referred Mother to four different service providers for combined mental health and substance abuse counseling, but Mother was terminated by each of those providers because she never contacted one of the agencies and did not regularly attend scheduled appointments with the others.  Mother sporadically engaged in medication management through telehealth appointments, but CSB remained concerned that Mother was not taking her psychiatric medications as prescribed and/or that the medications were not stabilizing her mental health.  Furthermore, Mother received mental health treatment during several psychiatric hospitalizations, but the caseworker had been unable to obtain any information about Mother's diagnoses, progress,

or recommended follow-up treatment because Mother did not sign information releases with the hospitals.

{¶14} By the time of the hearing, Mother was receiving sporadic mental health and substance abuse treatment through a fifth agency that Mother apparently contacted without a referral from CSB. A psychiatric nurse practitioner from that agency testified at the hearing because the trial judge ordered her to do so. Prior to that time, CSB had been unable to obtain information about Mother from this agency because Mother had refused to comply with the case plan requirement that she sign an information release with the service provider. At the hearing, the nurse practitioner testified that Mother had not consistently attended her scheduled appointments. Over a period of ten months, she had attended only four of her monthly appointments.

{¶15} Similarly, Mother submitted to drug screens only intermittently during this case. Although she continually told the caseworker that she was sober, Mother frequently tested positive for amphetamine, methamphetamine, and/or THC. After she tested positive for amphetamine, methamphetamine, and THC during February 2023, Mother refused to submit to any further drug tests. Evidence was presented at the hearing, however, that Mother overdosed on fentanyl two months before the hearing, which had required hospitalization and treatment with Narcan.

{¶16} Moreover, Mother continued to exhibit symptoms of her unstable mental health and/or substance abuse throughout this case. On numerous occasions, police were called to intervene into incidents involving Mother exhibiting erratic and sometimes violent behavior toward Father and other people. CSB presented evidence regarding some of these incidents through the testimony of police officers who were dispatched to incidents involving Mother on four separate dates during this case: May 8, 2022; September 24, 2022; March 4, 2023; and June

24, 2023. In addition to the testimony of each police officer, CSB played video footage from their body cameras, which depicted some of the interactions between Mother and police officers during each incident.

{¶17} The incident on May 8, 2022, involved several officers from the Cuyahoga Falls Police Department responding to a call about Mother assaulting a woman at a park by banging the woman's head into a picnic table. Through the testimony of one police officer and his body camera video, the following basic details about the incident were admitted into evidence. Mother's hostility toward the woman apparently arose when Mother arrived at the park to meet Father and saw him talking to this woman. When the officer arrived, the woman, Mother, and Father were standing in separate parts of a grassy area in the park. The officer, who was familiar with Mother and Father from prior incidents, briefly spoke to the woman and then approached Mother, who immediately became upset and denied that she had touched the woman. The officer handcuffed Mother and placed her in the back of his cruiser while he and other officers spoke to Father and the woman about the incident. Based on similar statements from Father and the woman, the officers determined that Mother would be arrested and charged for assaulting the woman.

{¶18} After the officer informed Mother that she would be arrested, she became agitated and responded by trying to kick the officers and by banging her head into the cruiser. The officers tried to calm Mother down, but she only became more agitated and began repeatedly expressing a desire to kill herself. The testifying officer transported Mother to a hospital for an involuntary 72-hour psychiatric admission. On the way to the hospital, Mother continued to attempt to harm herself by striking herself in the face with her handcuffed wrists. When they arrived at the hospital, Mother's face was bloody from the injuries she had inflicted on herself.

{¶19} Mother was admitted to the hospital and charged with a felony assault count as well as resisting arrest. The testifying officer explained at the permanent custody hearing that he been involved in "at least a dozen" similar encounters with Mother and that each had involved the same "pattern of behavior" of Mother responding to police officers in a hostile and violent manner.

{¶20} The incident on September 24, 2022, involved several different Cuyahoga Falls police officers responding to a call from Father about Mother's erratic behavior at their home and an alleged incident of domestic violence. When the testifying officer arrived at the scene, Mother was outside the house screaming and crying. She informed him that Father had hit and harmed her three days earlier and that, on the current date, she and Father had each perpetrated violence against the other with a pair of scissors. This officer also testified that he had responded to numerous domestic incidents between Mother and Father. His testimony and his body camera video further revealed that several officers responded to the scene, who spoke to Father and Mother. Father showed another officer a video that he had recorded on his phone during the incident, and the officer concluded that the video depicted Mother as the primary aggressor. Father told the police that he did not want Mother charged, but they decided to charge her based on the video that they had seen.

{¶21} After the police informed Mother that she would be arrested and charged, Mother exhibited a similar response to her behavior at her arrest on May 8. She physically resisted the officers' attempts to restrain her, became increasingly combative, started trying to harm herself, and repeatedly threatened to kill herself. Ultimately, EMS responded to the scene, restrained Mother on a gurney, and transported her to the hospital for psychiatric treatment.

{¶22} The incident on March 4, 2023, involved the Cuyahoga Falls Police responding to another location in an apartment building because 911 dispatch had received a hang up call and

sent the police to evaluate the situation. Some of the responding officers were also familiar with Mother and the man named John who lived in the apartment. After receiving no response to their knocks at the apartment door, they found John outside the apartment building and spoke to him. While speaking to John, the police observed Mother run across the parking lot. The testifying officer opined that Mother had run because there were numerous warrants out for her arrest.

{¶23} As explained through his testimony and depicted on his body camera video, the officer chased and caught up to Mother and noted that she smelled of alcohol. When he asked her how much she had had to drink, Mother responded, "a lot." While two officers tried to question Mother, she responded by kicking, spitting, and attempting to bite them. As the officers tried to get Mother into the back of a cruiser, she continued to resist their efforts to restrain her, and the police officers were unable to get her into the cruiser. Mother bashed her head into the cruiser, repeatedly threatened to kill herself, and became inconsolable. EMS responded to the scene to restrain Mother to a gurney and transport her to the hospital for psychiatric treatment.

{¶24} The incident on June 24, 2023, occurred in Akron, where Mother was then living. The officer who testified and recorded the incident on his body camera explained that Akron Police responded to the scene of a reported physical altercation and received contradictory statements from witnesses there. Mother explained that she had stabbed a man who attempted to break into her home. The man who had been stabbed informed the police that Mother had stabbed him after they had an argument inside the home, and he tried to leave. The initial police investigation revealed a large pool of blood on the porch, steps, and sidewalk at the front of the home and a blood trail leading to the man's vehicle. After assessing the witness statements and the blood trail, the officers decided to arrest Mother and charge her with felonious assault.

**{¶25}** The officers informed Mother that she would be charged and placed her in a police cruiser. Mother responded with physical resistance, repeated statements that she did not want to live, and she started bashing her head inside the police cruiser. The officers removed Mother from the cruiser, restrained her in a "wrap system" to minimize the harm she could cause herself, and transported her to Summit County Jail. Mother again caused her face to be bloodied by banging her head inside the cruiser.

**{¶26}** It is not clear from the record whether Mother received psychiatric treatment after this June 23 incident. The caseworker briefly testified that Mother was again involuntarily hospitalized for psychiatric treatment during May and June 2023, but she did not give the specific dates of those hospitalizations. Moreover, on the day of the hearing in July 2023, the caseworker further testified that she had just learned that Mother had been released "yesterday" from another psychiatric hospitalization and was then transported to the Summit County Jail.

**{¶27}** The evidence CSB presented at the permanent custody hearing clearly established that Mother had not substantially remedied the parenting problems that caused her children to be removed and remain placed outside her home. *See* R.C. 2151.414(E)(1). By the time of the hearing, Mother had been provided with reunification services for more than two years but had failed to consistently avail herself of those services and had not made progress on any of the reunification goals of the case plan. Therefore, the record supports the trial court's finding on the first prong of the permanent custody test.

**{¶28}** Next, the trial court found that permanent custody was in the best interest of these children. In reviewing the trial court's determination that permanent custody was in the best interest of M.C. and C.C., this Court focuses primarily on the best interest factors set forth in R.C. 2151.414(D). *In re M.S.*, 9th Dist. Summit Nos. 30506 and 30515, 2023-Ohio-1558, ¶ 25. In

making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, the custodial history of the children, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply.[1]  R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶29}  During most of this case, Mother's interaction with the children was limited to supervised visitation because Mother failed to stabilize her mental health or substance abuse problems.  The caseworker testified that Mother interacted well with both children during the visits and that she observed a bond between Mother and each child.  Mother's attendance at visits throughout this case had been sporadic, however.  Mother initially had visits scheduled twice a week, but her scheduled visits were later reduced to once a week because she attended only 13 of 31 scheduled visits.

{¶30}  Moreover, the overriding concern in this case was the lack of stability with Mother's mental health and behavior, which, based on the record, seemed to worsen during this case.  By the hearing in July 2023, Mother had not made progress toward stabilizing her mental health or her substance abuse problems and she was potentially facing significant terms of incarceration, as multiple felony and misdemeanor criminal charges were still pending against her.

{¶31}  The children in this case were too young to express their wishes, so the guardian ad litem spoke on their behalf.  She opined that permanent custody was in their best interest because Mother had not stabilized her mental health or taken significant steps toward achieving sobriety.

---

[1] CSB did not allege, and the trial court did not find, that any of those provisions applied to the facts of this case.

She testified that she had been with the caseworker once when Mother appeared to be under the influence of some substance but refused the caseworker's request that she submit to an oral swab. The guardian ad litem expressed concern that Mother had completely stopped submitting to drug tests during this case and that she had recently overdosed on fentanyl.

{¶32} By the time of the hearing, the case involving M.C. had been pending for well over two years. M.C. had been in the temporary custody of CSB for most of his life and C.C. had been in the agency's temporary custody for all his young life. Both children needed a legally secure permanent placement, and neither parent was prepared to provide them with that stability. CSB had been unable to find any suitable relatives who were willing and able to do so, so the trial court concluded that a legally secure permanent placement would be achieved by placing the children in the permanent custody of CSB.

{¶33} This Court's review of the record fails to demonstrate that the trial court lost it way in terminating Mother's parental rights and placing M.C. and C.C. in the permanent custody of CSB. *See Eastley* at ¶ 20. Mother's assignment of error is overruled.

III.

{¶34} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

BETTY SUTTON
FOR THE COURT

CARR, J.
CONCURS.

FLAGG LANZINGER, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

THOMAS C. LOEPP, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.